Aesthetic Management Partners, Inc. v. Trina Barr
Complaint

# Exhibit A

## Employment Agreement

**EMPLOYMENT AGREEMENT**

AGREEMENT, dated as of September 17, 2018 (the "Effective Date"), by and between Aesthetic Management Partners, Inc. (the "Company"), and Trina Barr ("Employee" or "Barr").

WHEREAS, the Company recognizes that the Barr's experience and abilities will be integral to the success of the Company; and,

WHEREAS, the Company wishes to secure the ongoing services of Barr pursuant to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth below, the parties hereby agree as follows:

1.      <u>Employment</u>. From and after the Effective Date, the Company hereby agrees to employ Barr as Vice President, Clinical & Product Development, and Barr hereby accepts such employment, on the terms and conditions set forth below.

2.      <u>Term</u>. The Employee's employment shall begin on the Effective Date, or at such later date as the parties may mutually agree, but no later than October 1, 2018, and end on the one year anniversary thereof unless otherwise extended as provided herein (the "Initial Employment Period"), but shall be subject to earlier termination as provided herein.

The Initial Employment Period shall automatically renew every year on the anniversary date thereof for an additional year provided Barr meets the Company goals as defined herein and is not otherwise in breach of any terms and conditions set forth herein (the "Extended Employment Period"). For purposes hereof, the "Employment Period" shall mean both the Initial Employment Period and the Extended Employment Period.

3.      <u>Duties, Responsibilities, Authority of Employee</u>. During the Employment Period, the Employee shall hold the title Vice President of Product Development and Clinical Integration or such title as the parties may otherwise mutually agree.  As such, Employee hereby agrees to perform or abide by the following:

(a)     <u>Direct Report</u>.  The Employee shall report directly to both <u>the Company's President and CEO</u>.

(b)     <u>Prioritizing Company</u>.  Unless otherwise authorized by the Company, during the Employment Period, the Employee shall devote the majority of her working time, attention and energies during normal business hours (other than absences due to illness or vacation) to the performance of his or her duties for the Company.  The Company acknowledges Employee's separate and ongoing efforts in connection with her existing aesthetics clinic and training business ("Existing Business").  Employee represents and warrants that Employee does not have obligations or relationships, including any with any Existing Business, that could (i) present a conflict with performing her duties as specified herein, (ii) prevent Employee from performing her employment duties, including those as specified herein, or (iii) present a potential for disclosure of information to Company that Employee is obligated to keep confidential.

(c)      Clinical Training and Experiential Learning Facilitation.  Barr will contribute the services of any Existing Business toward clinical training in a manner and amount reasonably satisfactory to AMP, and shall further contribute her time and effort, knowledge, and expertise toward her role as AMP's sole provider of clinical training for all AMP Products.  Barr agrees any such training performed by her at AMP's direction be fully compatible and fluent with any AMP Product instructions for use, including any representations and warranties bearing thereon, and Barr hereby agrees to fully and regularly familiarize herself with any and all such product information and product literature, including any revisions.

(d)      Product Development. Barr further agrees she will use her relationships experience, knowledge of the field and overall business acumen to identify and source new technologies, including protocols and combinations of such technologies, for AMP as well as working directly with AMP's OEM manufacturer(s) or supplier(s) to identify, develop or design future products for AMP.

(e)      Exclusive Licenses.  Barr will use her best efforts to source for AMP, at its request, exclusive licensing deals for the entire US Aesthetic Market for those products she identifies or brings to the attention of AMP.

(f)      Key Performance Indicators.   The parties agree that Employee's regular and effective provision, under Company's supervision and control, of the following acts or services shall serve as ongoing criteria for good faith fulfillment of her duties hereunder:

- Development and deployment of facilities and premises, including such as may comprise Employee's Existing Business for the successful clinical integration and experiential, immersive instruction and learning for customers or users of Company Products
- Management and development of any Company employees placed under Employee's control including use of Existing Business resources and premises in support thereof
- Creation of a Product Roadmap for the Future, including such for any FormaTK Products distributed or sold by Company
- Securing or otherwise sourcing new lines for distribution through research and networking
- Facilitate Company Sales Team Training sessions
- Facilitate Company Clinical Team Training sessions
- Facilitate sales in any Company sales territories via phone for closing meetings
- Facilitate naming and branding of procedures and protocols for marketing and sale by AMP.
- Maintain and facilitate KOL relationships in any Company sales territories.
- Develop Distributor Relationships within US to enhance sales team.

4.      Compensation, Benefits, Commissions, Equity and Expenses.

(a)      Salary.  Employee will be paid a base compensation at the rate stated in Rider A (the "Base Compensation").  The Base Compensation shall be paid in approximately equal installments in accordance with the Company's customary payroll practices in effect from time to time and subject to all applicable income and employment tax withholdings. The Base Compensation may be increased by us, and if so, such increased Base Compensation will be the Base Compensation for all purposes under this Agreement.

      (b)    Benefits. Employee (and any eligible spouse and dependents) will also be entitled to participate in AMP's comprehensive benefits program available to AMP's executive level employees, as such may be established, otherwise, as may be offered to AMP's District Sales Manager staff.

      (c)    Commissions. In addition to the above salary, Employee will also be entitled to sales commissions for every product sold by Employee, or anyone working under Employee's direction and control, during the course of Employee's employment with Company, pursuant to Company's Commissions Policy set forth in Rider B which is incorporated herein by reference.

      (d)    Equity. Provided Barr materially satisfy the criteria outlined in Section 3 and remain in compliance hereunder, on or before October 1, 2018, and on each successive anniversary thereof for a period of four (4) years in total, Barr shall be awarded equity in the form shares of common stock of AMP as may be separately agreed to.

      (e)    Expenses. Company will reimburse Employee's customary and reasonable expenses incurred in connection with performance of her duties for the Company, including any travel and lodging[1].

    5.    Termination. The Employee's employment hereunder may be terminated during the Employment Period under the following circumstances:

      (a)    Death. The Employee's employment hereunder shall terminate upon death.

      (b)    Disability. The Company shall have the right to terminate the Employee's employment as a result of the Employee's Disability (as defined below) as determined by a physician selected by the Employee, and reasonably acceptable to the Company. "Disability" shall mean (i) the Employee's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve (12) months; or (ii) the Employee is determined to be totally disabled by the Social Security Administration.

      (c)    Cause. The Company may terminate the Employee's employment for "Cause." For purposes of this Agreement, the Company shall have "Cause" to terminate the Employee's employment only upon the Employee's:

      (i)    willful gross misconduct or conviction of a felony after the Effective Date;

or,

      (ii)    willful and continued failure to perform any duties hereunder extending for ten or more business days after the Company delivers a written demand for performance that specifically identifies the actions to be performed.

---

[1] The Company does not have an accountable expense reimbursement plan and as such, all amounts paid to you will be considered compensation (but shall not be counted as Base Compensation), included on your Form W-2 and subject to all income and payroll taxes.

(d)     Good Reason. Employee may terminate his or her employment after giving the Company detailed written notice thereof, if the Company shall have failed to cure the event or circumstance constituting "Good Reason" within ten business days after receiving such notice. Good Reason may include:

(i)     any failure by the Company to comply with Section 5 hereof in any material way;

(ii)    the failure of the Company to comply with and satisfy Section 12(a) of this Agreement; or,

(iii)   any uncured material breach of this Agreement by the Company.

(e)     Without Cause. The Company or Employee shall have the right to terminate the Employee's employment hereunder at any time without Cause, i.e., for convenience, by providing the other party with a Notice of Termination.

6.      Termination Procedure.

(a)     Notice of Termination. Any termination of the Employee's employment by the Company during the Employment Period (other than pursuant to Section 6(a)) shall be communicated by written Notice of Termination to the other party. For purposes of this Agreement, a "Notice of Termination" shall mean a notice indicating the specific termination provision in this Agreement relied upon and setting forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Employee's employment under that provision.

(b)     Date of Termination. "Date of Termination" shall mean (i) if the Employee's employment is terminated by his or her death, the date of death, (ii) if the Employee's employment is terminated pursuant to Section 6(b), thirty (30) days after the date of receipt of the Notice of Termination (provided that the Employee does not return to the substantial performance of his or her duties on a full-time basis during such thirty (30) day period), and (iii) if the Employee's employment is terminated for any other reason, the date on which a Notice of Termination is given or any later date (within thirty (30) days after the giving of such notice) set forth in such Notice of Termination.

(c)     Immediate Termination for Cause.  Notwithstanding the foregoing in both this Section and Section 5(c) above, Company may terminate Employee immediately upon conduct by Employee which is considered by Company to be unethical, unprofessional, fraudulent, unlawful or plainly adverse to the interest, reputation or business of Company, including but not limited to conduct which would be deemed by a reasonable person to be intimidating, immoral, coercive or harassing.

7.      Termination without Cause or by the Employee for Good Reason.

(a)     By Company.  If the Employee's employment is terminated by the Company without Cause or by Employee for Good Reason, other than during the Initial Employment Period, within thirty (30) days following the Date of Termination:

(i)      the Company shall pay Employee a lump sum payment equal to the sum of twelve (12) months' Base Compensation less any income and withholding;

(ii)     if the Date of Termination occurs during the Initial Employment Period, the Company shall continue to pay the Base Compensation through the end of the Initial Employment Period; and,

(iii)    the Company shall continue to provide the Employee and eligible spouse and dependents for the remaining term of the current Employment Period (as if no Date of Termination had occurred) the medical, hospitalization, dental and life insurance programs provided for in Section 4, as if the Employee had remained employed; provided that such benefits shall terminate on the date or dates the Employee becomes eligible to receive equivalent coverage and benefits under the plans and programs of a subsequent employer.

(b)     By Employee. If the Employee's employment is terminated by Employee without cause or Good Reason, no further compensation or benefits shall be due or payable to Employee immediately upon any such Date of Termination other than commissions owed prior to such date pursuant to Company's Commissions Policy set forth in Rider B which is incorporated herein by reference.

8.      Confidential Information; Noncompetition; Non-solicitation; Non-disparagement.

(a)     Confidential Information.  Except as may be required or appropriate in connection with carrying out duties under this Agreement, the Employee shall not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, or as is necessary in connection with any adversarial proceeding against the Company (in which case the Employee shall cooperate with the Company in obtaining a protective order at the Company's expense against disclosure by a court of competent jurisdiction), communicate, to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform his or her duties hereunder, any trade secrets, confidential information, knowledge or data relating to the Company, its affiliates or any businesses or investments of the Company or its affiliates, obtained by the Employee during the Employee's employment by the Company that is not generally available public knowledge (other than by acts by the Employee in violation of this Agreement.)

(b)     Noncompetition. During the Employment Period and until the 12-month anniversary of the Employee's Date of Termination if the Employee's employment is terminated by the Company for Cause or the Employee terminates employment without Good Reason, the Employee shall not engage in or become associated with any Competitive Activity. For purposes of this Section 8(b), a "Competitive Activity" shall mean any business or other endeavor that engages in any country in which the Company has significant business operations to a significant degree in a business that directly competes with all or any substantial part of any of the Company's businesses participated in or advanced by Employee during the Employment Period.

The Employee shall be considered to have become "associated with a Competitive Activity" if he or she becomes involved as an owner, employee, officer, director, independent contractor, agent, partner, advisor, or in any other capacity calling for the rendition of the Employee's personal services, with any individual, partnership, corporation or other organization that is engaged in a

Competitive Activity and such involvement relates to a significant extent to the Competitive Activity of such entity.

If, at any time, the provisions of this Section 8(b) shall be determined to be invalid or unenforceable, by reason of being vague or unreasonable as to area, duration or scope of activity, this Section 8(b) shall be considered divisible and shall become and be immediately amended to only such area, duration and scope of activity as shall be determined to be reasonable and enforceable by the court or other body having jurisdiction over the matter; and the Employee agrees that this Section 8(b) as so amended shall be valid and binding as though any invalid or unenforceable provision had not been included herein.

Company acknowledges and agrees that resumption or continuance of Employee's Existing Business following any Date of Termination hereunder shall not be deemed a Competitive Activity, provided that Employee continue to abide by any terms or provisions of this Agreement that survive Termination hereunder, including this noncompetition section.

(c)     Non-solicitation. During the Employment Period, and for 12 months after the Employee's Date of Termination if the Employee's employment is terminated by the Company for Cause or the Employee terminates employment without Good Reason, the Employee will not, directly or indirectly, (1) solicit for employment by other than the Company any person employed by the Company or its affiliated companies as of the Date of Termination, (2) solicit for employment by other than the Company any person known by the Employee (after reasonable inquiry) to be employed at the time by the Company or its affiliated companies as of the date of the solicitation or (3) solicit any customer or other person with a business relationship with the Company or any of its affiliated companies to terminate, curtail or otherwise limit such business relationship.

(d)     Non-disparagement. During the Employment Period and for two (2) years thereafter, (i) neither the Employee, nor anyone acting on behalf of the Employee, shall make or publish any disparaging or derogatory statement (whether written or oral) regarding the Company or any of its affiliated companies or businesses that are known to the Employee to be so affiliated, and (ii) neither the Company nor any of its affiliated companies or businesses or their affiliates, nor anyone authorized by the Company to speak on behalf of the Company, shall make or publish any disparaging or derogatory statement (whether written or oral) regarding the Employee.

(e)     Injunctive Relief. In the event of a breach or threatened breach of this Section 9, the Employee agrees that the Company shall be entitled to injunctive relief in a court of appropriate jurisdiction to remedy any such breach or threatened breach, the Employee acknowledging that damages would be inadequate and insufficient.

9.     Indemnification.

(a)     General. The Company agrees that if the Employee is made a party or is threatened to be made a party to any action, suit or proceeding by reason of the fact that the Employee is an employee of the Company, the Employee shall be indemnified and held harmless by the Company.

(b)     Notice of Claim. The Employee shall give to the Company notice of any claim made against her for which indemnification will or could be sought under this Agreement. In addition, the Employee shall give the Company such information and cooperation as it may reasonably require and as shall be within the Employee's power.

6

10.     Legal Fees and Expenses. If any contest or dispute shall arise between the Company and the Employee regarding any provision of this Agreement, each side shall bear its own costs and fees.

11.     Successors; Binding Agreement.

(a)     Company's Successors. As used in this Agreement, "Company" shall include any successor to its business and/or assets (by merger, purchase or otherwise) which executes and delivers the agreement provided for in this Section 11 or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

(b)     Employee's Successors. No rights or obligations of the Employee under this Agreement may be assigned or transferred by the Employee other than rights to payments hereunder.

12.     Notice. For the purposes of this Agreement, notices, demands and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered either personally or by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Employee:

At _____

_____

_____

If to the Company:

At _____

_____

_____

or to such other address as any party may have furnished to the others in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

13.     Miscellaneous. No provisions of this Agreement may be amended, modified, or waived unless such amendment or modification is agreed to in writing signed by the Employee and by a duly authorized officer of the Company.  No waiver by either party hereto at any time of any breach by the other party hereto of any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement. The respective rights and obligations of the parties hereunder of this Agreement shall survive the Employee's termination of this Agreement without Good Reason.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Tennessee without regard to its conflicts of law principles.  The Parties agree that courts of competent jurisdiction in Shelby County, Tennessee and the United States District Court for the Western District of Tennessee shall have concurrent jurisdiction with the arbitration tribunals of the American Arbitration Association for

7

purposes of entering temporary, preliminary and permanent injunctive relief with regard to any action arising out of any breach or alleged breach of this Agreement. The Parties agree to submit to the personal jurisdiction of such courts and any other applicable court within the state of Tennessee.

14.     Arbitration. The Parties waive any claim that they may have that any of the foregoing courts is an inconvenient forum. The Parties agree that all controversies, claims, disputes and matters in question arising out of, or related to this Agreement, the performance under this Agreement, the breach of this Agreement or any other matter or claim whatsoever shall be decided by binding arbitration before the American Arbitration Association, utilizing its Commercial Rules. Venue for any arbitration between the Parties shall be had and is mandatory in Memphis, Tennessee to the exclusion of all other places of venue, for all matters that arise under this Agreement.

15.     Validity.  The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

16.     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

17.     Entire Agreement. This Agreement sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and, upon the commencement of the Employment Period, supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or Employee of any party hereto in respect of such subject matter.

18.     Withholding. All payments hereunder shall be subject to any required withholding of Federal, state and local taxes pursuant to any applicable law or regulation.

19.     Section Headings. The section headings in this Employment Agreement are for convenience of reference only, and they form no part of this Agreement and shall not affect its interpretation.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this _17_ day of September, 2018.

Trina Barr

AESTHETIC MANAGEMENT PARTNERS, INC.

By: _____
        Adrian Bishop
Title:    President

**RIDER A**

Base Compensation:  $80,000

## RIDER B

## COMMISSIONS POLICY

In addition to Base Compensation, AMP will pay you commissions in accordance with the provisions set forth below for completed sales by you during the term of your Employment with AMP ("Commissions"). Commissions will be paid in accordance with the terms set out below and any additional terms and conditions then in force between AMP and its area sales managers.

Notwithstanding the foregoing, AMP reserves the right to amend any and all terms of this Rider B in its sole discretion, including expressly its right to raise or lower any Split Price listed herein. In any such case, AMP will notify you not less than thirty (30) days prior to any change in Commissions and will in no case retroactively amend or reduce any Commissions fully accrued or otherwise owing to you, other than as set forth below herein. Any amended commission percentages will take effect the first day of the month immediately following AMP's written notice of such amended commission percentage to you.

You will be entitled to receive payment of any Commissions earned after an end-user customer issues a valid purchase order and the Products are invoiced by AMP. Commissions earned under this Agreement shall be paid by AMP monthly. This payment is paid by the last business day of the calendar month following the month within which the purchase order was received. AMP reserves the commercially reasonable right to alter or change Commission payment dates based on end user's payment terms and any such payment shall be subject to our actual receipt of payment from customer sale by which you claim your Commission.

Any reduction or off-set to an account receivable (e.g., because of refund, return, credit, lack of payment, write-down of non-collectable account at AMP's discretion, etc.) at any time will lead to a corresponding deduction from any outstanding or future payments of Commissions owed to you. In the event any such account receivables is later paid in full or in part by the customer, AMP will make a corresponding adjustment to your outstanding or future payments of Commissions. In connection with the foregoing, you will make all reasonable efforts to abide by any returned goods policy as AMP may adopt or later amend from time to time.

You have no authority to accept orders on behalf of the Company or to bind or commit the Company to deliver any products or services, or assume or perform any other obligation regarding any AMP customer or prospective customer, and you will not make any representation or warranty on behalf of the Company other than as authorized in writing by the Company.

You must use only the copyrighted materials, trademarks, trade names and service marks, including any licensed trade names and service marks the Company and its subsidiaries and product partners make available to you, provided such use is solely in connection with the performance of your obligations hereunder and in accordance with the policies and procedures established by the Company from time to time.

You will quote only the prices, delivery schedules, and other terms and conditions supplied by the Company. All orders solicited and taken by you shall be submitted to only to AMP and are subject to acceptance and confirmation in writing by a duly authorized officer of the Company. Only the Company shall make decisions regarding a customer's credit and all matters relating to billing to customers. All quotations for Company products made by you to AMP customers or prospective customers must be

made expressly subject to the approval and confirmation of the Company and are not final until AMP gives you such approval in writing.

AMP reserves the right, in its sole discretion, to decline to accept any order and to change or discontinue the marketing of any of our products, without prior notice to you.  In the event that the Company declines to accept any such order or change or discontinue the marketing of any of the products the Company shall not be liable to you for the payment of any commission or fees that would have been payable hereunder had such order been accepted by the Company.

AMP may, in its sole discretion, cancel any order, either in whole or in part, at any time after acceptance by the Company and the Company shall be relieved of all of its obligations with respect to commissions and fees thereto, except for any commissions already due at time of cancellation from payments already made by customer.

All payments hereunder shall be subject to any required withholding of Federal, state and local taxes pursuant to any applicable law or regulation.  You agree your failure to strictly adhere to the above provisions shall be a material breach of this Agreement and shall serve as sufficient grounds for termination for cause hereunder.

Aesthetic Management Partners, Inc.

2018 Equity Incentive Plan

STOCK OPTION AWARD AGREEMENT

| Participant Name: | |
|---|---|
| Participant Address: | |
| Award Date: | |
| Number of Shares: | 2,000,000 |
| Exercise Price per Share: | $0.75 |
| Incentive Stock Option (Y/N): | |
| Term of Option: | 10 years from Award Date |
| Vesting: | 400,000 of the Shares shall vest on or before October 1, 2018;  400,000 upon the first anniversary of the Award Date; 400,000 upon the second anniversary; 400,000 upon the third anniversary; and, 400,000 on the fourth aniversary of the Award Date subject to the conditions hereinafter provided |

This Stock Option Award Agreement (the "*Agreement*") is entered into between Aesthetic Management Partners, Inc. ("*Company*") and the individual identified above ("*Participant*") as of the date indicated above (the "*Award Date*") as a condition of the Company's award to the Participant of options to purchase the Company's Common Stock, subject to the terms and conditions of this Agreement and the Aesthetic Management Partners, Inc. 2018 Equity Incentive Plan, a copy of which is attached as **Exhibit A** (the "*Plan*").

Company and Participant hereby agree as follows:

1.

2.     Incorporation of Plan; Definitions.     The Plan is incorporated in and made a part of this Agreement.  All capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed in the Plan.  In the event of a conflict between the provisions of this Agreement and those of the Plan, the provisions of the Plan shall control.

3.     Award of Option.  Company hereby grants to Participant, and Participant accepts, the right and option to purchase the number of Shares of Common Stock indicated above on the terms and conditions set forth in this Agreement (the "*Option*").  If the Option is indicated above to be an Incentive Stock Option, then the Option is intended to be an Incentive Stock Option within the meaning of Section 422 of the Tax Code; provided, however, that to the extent any limitations on such treatment set forth in the Plan are applicable, the Option will be treated as a non-qualified option for tax purposes and under this Agreement.

4.     Exercise Price.  The per Share purchase price of the Shares subject to the Option shall be the exercise price per Share indicated above.  To the extent the Option is an Incentive Stock Option, the Plan Committee, acting in good faith, has determined that the per Share purchase price is equal to at least 100% of the

Fair Market Value per Share as of the Award Date (or, if Participant as of the Award Date is a 10% Stockholder, that the per Share purchase price is equal to at least 110% of the Fair Market Value per Share as of the Award Date).

5.     Term of Option.  Unless terminated sooner as provided in this Agreement, and unless the Plan sets forth a shorter term, the term of the Option shall be for the period of time indicated above, terminating at the close of business on the last day of such term or, if such day is not a business day, the immediately preceding business day (the "*Term*").

6.     Vesting.     Subject to the Continuous Service of Participant, the Option shall vest and become exercisable during the Term on the schedule and/or subject to the conditions indicated above or, if expressly indicated above that no such schedule or conditions shall apply (as with the term "none" or "N/A"), the Option shall be exercisable in accordance with this Agreement upon the Award Date.     The Participant shall be deemed to provide "Continuous Service" to the Company for so long as the Participant is providing services to the Company in the capacity of an officer, director, employee or consultant.

7.  Acceleration of Vesting.  Upon the terms and conditions set forth in the Plan, vesting of the Option shall accelerate upon a Change of Control.

8.  Stockholder Agreements.  As a condition to receipt of any award granted under the Plan (including the exercise of any Option), the Participant at the request of the Company shall become a party to a voting agreement, stockholder agreement, investor rights agreement, or other similar agreement generally applicable to stockholders, if any such agreement is in force at the relevant time between or among the Company and any of its stockholders.  In connection with such requirement, the Company shall provide the Participant with a copy of the latest such agreement, or substitute agreement, if any, and shall arrange for the Participant's execution of an original counterpart thereof.  If the Participant refuses to execute such agreement, the Company shall cause any tendered payment made by the Participant in connection with the award to be returned to the Participant and the Participant's attempted Option exercise, as the case may be, shall be null and void ab initio and without effect.

9.  Procedure for Exercise.  During the Term, to the extent exercisable, Participant (or, to the extent provided in the Plan, Participant's transferee) may exercise the Option to purchase Shares as provided in the Plan.

10.  Termination.  The Option shall terminate upon a Separation or Forfeiture Event as provided in the Plan.

11.  Transferability of Option.  The Option shall be transferable only to the extent expressly provided in the Plan.

12.  Right of First Refusal.  Shares purchased pursuant to the Option shall be subject to a right of first refusal in Company as provided in the Plan.

13.  Tax Consequences.  Participant acknowledges Company's suggestion that Participant consult with his or her personal tax advisor regarding the tax consequences of accepting and exercising the Option and any other matters related to this Agreement, and Participant represents that he or she is not relying on any statements or representations of Company or any Affiliate or any of its agents or representatives in this regard.  Participant understands, acknowledges, and agrees that Participant shall be solely responsible for any tax liability of Participant that may arise as a result of this Agreement or the transactions contemplated by this Agreement.

14.  Tax Withholding.  Company may make such provisions and take such steps as it may deem necessary or appropriate to ensure that all applicable payroll, withholding, income, or other taxes are withheld or collected from Participant to the extent required by applicable law, and Participant agrees to make any such payments to Company.  If the Option is an Incentive Stock Option, Participant agrees to notify Company in writing immediately upon making a Disqualifying Disposition of any Shares purchased pursuant to the Option.

15.  Securities Law Compliance.  Participant acknowledges receipt of a copy of the Plan.  Participant warrants that any Shares purchased upon exercise of the Option will be acquired for Participant's own account for investment only and not with a view to, or for sale in connection with, any distribution of such Shares in violation of the Securities Act of 1933 or any applicable state securities laws or any rules or regulations promulgated thereunder.  Participant represents that his or her principal residence is at the address set forth above and agrees to notify Company promptly of any change in such address.

16.  General Provisions.

(a)  No Rights as a Shareholder.  Neither Participant nor any other holder of the Option shall have any of the rights or privileges of a stockholder of Company with respect to the Shares subject to the Option unless and until such Shares are issued upon exercise of the Option.

(b)  No Right to Employment or Engagement.  Nothing in this Agreement or the Plan shall be construed as giving Participant the right to be retained as an employee or director of, or contractor to, Company or any Affiliate.

(c)  Interpretation.  Any question of administration or interpretation arising under this Agreement shall be determined by the Plan Committee, and such determination shall be final, conclusive, and binding upon all parties in interest.

(d)  Notices.  All notices given pursuant to this Agreement shall be given and deemed given as set forth in the Plan.

(e)  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee without regard to its  conflict of law principles of Tennessee or those of any other jurisdiction.

(f)  Sections and Headings.  The division of this Agreement into sections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

- 2 -

Company and Participant have caused this Agreement to be executed by as of the Award Date.

COMPANY:

AESTHETIC MANAGEMENT PARTNERS, INC.

By _____
Adrian Bishop, President

PARTICIPANT:

_____
Trina Barr

**Exhibit A**
**2018 Equity Incentive Plan**

See attached.