Aesthetic Management Partners, Inc. v. Trina Barr
Complaint

# Exhibit F

# Barr's Answer to Verified Amended Demand for Arbitration and Counterclaim of Respondent

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION RULES

DEMAND FOR ARBITRATION

| | | |
|---|---|---|
| AESTHETIC MANAGEMENT PARTNERS, INC. | ) ) ) | |
| Claimant | ) ) | Case No. 01-19-0003-2124 |
| v. | ) ) | |
| TRINA BARR | ) ) ) | |
| Respondent | ) ) | |

### ANSWER TO VERIFIED AMENDED DEMAND FOR ARBITRATION AND COUNTERCLAIM OF RESPONDENT

Name of Claimant: Aesthetic Management Partners, Inc.

Address**:** 2492 Walnut Avenue, Suite 120

City, State, Zip: Tustin, CA 92780

Phone**:** 877-267-2670

Email**:** mark.crosby@ampgrowth.net

Name of Representative: Raymond W. Martin and Michele O. Choe

Name of Firm: Wheeler Trigg O'Donnell LLP

Representative Address: 370 Seventeenth St., Suite 4500

City, State, Zip: Denver, CO 80202

Phone: 303-244-1800

Email:  martin@wtotrial.com

choe@wtotrial.com

Respondent:     Trina Barr

Address:        6991 Jay Road

City, State, Zip: Boulder, CO  80301

Phone:  303-956-0094

Email:  trina.m.Barr@gmail.com


     Name of Representative:  William W. Cochran, William O'Meara

     Name of Firm:   Cochran Freund & Young LLC

     Representative Address: 2026 Caribou Drive, Suite 201

     City, State, Zip: Fort Collins, CO 80525

     Phone: 970-492-1100

     Email:   billc@patentlegal.com

            billo@patentlegal.com

**INTRODUCTION**

1.      Claimant, Aesthetic Management Partners, Inc. ("AMP"), through their attorneys, submitted a Verified Amended Demand for Arbitration (Case No.:01-19-0003-2124)  against Respondent Trina Barr on October 13, 2019.  The Demand references two agreements signed by AMP and Ms. Barr (collectively, "the parties"), an Employment Agreement **(Exhibit 1)** signed on or about September 17, 2018 and a Notice of Termination and General Release **(Exhibit 2)** signed on or about April 18, 2019. Both of these documents are also relevant to the employer/employee relationship between AMP and Ms. Barr, which is the subject of  a wage claim entitled Trina Barr vs Aesthetic Management Partners Inc. filed by Ms. Barr through her attorneys Elkus and Sisson on December 10, 2019, in Boulder County District Court of Colorado.

Respondent Trina Barr ("Ms. Barr") answers Claimant's Verified Amended Demand for Arbitration as follows:

0.   (Claimant's Introduction) This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this introduction paragraph.

1.   Ms. Barr is without knowledge and information to admit or deny the allegation in this paragraph and therefore must assert a denial of this paragraph 1.

2.    Ms. Barr admits the allegation of this paragraph 2.

3.   This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 3.

4.   Ms. Barr is without knowledge and information to admit or deny the allegation in this paragraph and therefore must assert a denial of this paragraph 4.

5.   This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 5.

6.   This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 6.

7.  This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 7.

8.  Ms. Barr denies the allegation of this paragraph 8.

9.  Ms. Barr admits the allegation of this paragraph 9.

10. Ms. Barr admits the allegation of this paragraph 10.

11. Ms. Barr admits the allegation of this paragraph 11.

12. Ms. Barr admits the allegation of this paragraph 12.

13. Ms. Barr admits the allegation of this paragraph 13.

14. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 14.

15. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 15.

   a. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 15a.

   b. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 15b.

   c. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 15c.

16. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 16.

17. Ms. Barr denies the allegation of this paragraph 17.

18. Ms. Barr denies the allegation of this paragraph 18.

19. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 19.

20. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 20.

21. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 21.

22. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 22.

23. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 23.

24. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 24.

25. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 25.

26. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 26.

27. Ms. Barr denies the allegation of this paragraph 27.

28. Ms. Barr admits the allegation of this paragraph 28.

29. Ms. Barr denies the allegation of this paragraph 29.

    a.  Ms. Barr denies the allegation of this paragraph 29a.

    b.  Ms. Barr denies the allegation of this paragraph 29b.

    c.  Ms. Barr denies the allegation of this paragraph 29c.

    d.  Ms. Barr denies the allegation of this paragraph 29d.

    e.   Ms. Barr denies the allegation of this paragraph 29e.

    f.   Ms. Barr denies the allegation of this paragraph 29f.

30. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 30.

31. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 31.

32. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 32.

33. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 33.

34. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 34.

35. Ms. Barr denies the allegation of this paragraph 35.

36. Ms. Barr denies the allegation of this paragraph 36.

37. Ms. Barr is without knowledge and information to admit or deny the allegation in this paragraph and therefore must assert a denial of this paragraph 37.

38. The averment of this paragraph is denied, states a legal conclusion, and there was no agreement because Ms. Barr signed the release under duress.

39. Ms. Barr denies the allegation of this paragraph 39.

40. Ms. Barr denies the allegation of this paragraph 40.

41. Ms. Barr denies the allegation of this paragraph 41.

42. Ms. Barr is without knowledge and information to admit or deny the allegation in this paragraph and therefore must assert a denial of this paragraph 42.

43. Ms. Barr denies the allegation of this paragraph 43.

44. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 44.

45. Ms. Barr admits the allegation of this paragraph 45.

46. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 46.

47. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 47.

48. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 48.

49. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 49.

50. Ms. Barr admits the allegation of this paragraph 50.

51. Ms. Barr admits the allegation of this paragraph 51.

52. Ms. Barr admits the allegation of this paragraph 52.

53. Ms. Barr is without knowledge and information to admit or deny the allegation in this paragraph and therefore must assert a denial of this paragraph 53.

54. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 54.

55. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 55.

56. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 56.

57. Ms. Barr denies the allegation of this paragraph 57.

58. Ms. Barr denies the allegation of this paragraph 58.

59. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 59.

60. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 60.

61. Ms. Barr denies the allegation of this paragraph 61.

62. Ms. Barr denies the allegation of this paragraph 62.

63. Ms. Barr denies the allegation of this paragraph 63.

64. Ms. Barr denies the allegation of this paragraph 64.

65. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 65.

66. This averment is not based on any action or allegation on the part of Ms. Barr. As such, no response is required for this paragraph 66.

67. Ask Trina.

68. Ms. Barr denies the allegation of this paragraph 68.

69. Ms. Barr denies the allegation of this paragraph 69.

70. Ms. Barr denies the allegation of this paragraph 70.

71. Ms. Barr denies that AMP's requested relief is proper. The Equipment has already been returned to AMP, even though AMP had no right to repossess the Equipment, as set forth in Ms. Barr's **Exhibit 3**.

72. Ms. Barr denies the allegation of this paragraph 72.

73. Ms. Barr denies the allegation of this paragraph 73.

74. Ms. Barr denies the allegation of this paragraph 74.

75. Ms. Barr denies the allegation of this paragraph 75.

76. Ms. Barr denies the allegation of this paragraph 76.

77. Ms. Barr denies the allegation of this paragraph 77.

78. Ms. Barr is without knowledge and information to admit or deny the allegation in this paragraph and therefore must assert a denial of this paragraph 78.

79. Ms. Barr denies the allegation of this paragraph 79.

80. Ms. Barr admits the allegation of this paragraph 80

## RESPONDENT'S FURTHER ALLEGATIONS

### BACKGROUND

**Ms. Barr's Experience in the Aesthetics Industry Before Joining AMP**

101.     Ms. Barr holds a Bachelor of Science degree from Texas A& M University.

102.     Ms. Barr has worked in the field of medical aesthetics since 2012.

103.     Ms. Barr is a licensed aesthetics clinician, who has herself developed many protocols for aesthetic treatments related to body and skin.

104.     Ms. Barr and her husband Adam Barr own and operate a medical spa, Med Aesthetics 360, located at 2995 Baseline Road #112 Boulder, Colorado 80303 ("Barr's Clinic" or "Clinic").

105.     During her period of employment with AMP and pursuant to the AMP Employment Agreement, Ms. Barr continued to operate Barr's Clinic.

106.     The protocols developed by Ms. Barr at her Clinic are currently used with several state of the art aesthetics systems.

107.     Ms. Barr's many Clinic patients rely on her for aesthetics treatments and advice.

108.     As a result of her long and active involvement in the aesthetics industry, Ms. Barr had an extensive list of contacts with important organizations and individuals in the aesthetics industry before she joined AMP.

109.     Her contacts included many medical doctors and other aesthetic clinic owners.

110.     The clinic owners trusted Ms. Barr to give them candid advice regarding expensive aesthetics systems they planned to purchase.

111.     Clinic owners also relied on Ms. Barr for training their medical staffs in proper use of such advanced systems.

112.     Such medical staff training often included instruction in the use of medical protocols that Ms. Barr had herself developed.

113.     Aesthetic system manufacturers had long consulted with Ms. Barr because of her extensive knowledge of such systems.

114.     Ms. Bar provided these manufacturers with advice regarding best methods of use and improvements to their systems.

115.     Amoung Ms. Barr's many contacts before joining AMP included a distributor agreement with one of  the manufacturers, NEOGEN, of the three machines that were initially at issue in this arbitration— ADVATX, NEOGEN, and SCARLET.

116.     Ms. Barr's many contacts in the industry, her training methods, her medical protocols, and her aesthetcs equipment improvements and inventions are important intellectual property assets owned exclusively by Ms. Barr.

117.     Ms. Barr developed and owned most of this intellectual property ("IP") in the aesthetics industry before joining AMP.  Much of this prexisting IP relates to aesthetic equipment she used at the Barr Clinic. Ms. Barr's excellent reputation for providing all of her contacts with honest and accurate information is among her most valuable assets.

118.     Ms. Barr's excellent reputation and her many existing agreements with distributors and her other contacts made Ms. Barr an extremely attractive corporate officer candidate to AMP.

**Ms. Barr Joins AMP**

119.     Ms. Barr joined AMP June 21, 2018 as its **Vice President of Clinical and Product Development.**

120.     As previously indicated, at the time she was hired by AMP, many aesthetics system manufacturers used  Ms. Barr to help them test and improve their products.

121.     After joining AMP, Ms. Barr continued to conduct aesthetic system development work at her clinic in Boulder. She educated AMP's customers, many of whom were customers she had brought with her to AMP.

122.     These customers Ms. Barr brought with her included aesthetics machine distributors and prospective aesthetics system buyers. Through her clinical practice Ms. Barr understood many of the machines better than the distributors.

122.     Ms. Barr's educational outreach was extremely valuable to AMP for closing deals and ensuring that clinic customers were satisfied with the machines they purchased.

**AMP's Plan to Misappropriate Ms. Barr's IP**

123.     On information and belief, shortly after Ms. Barr joined AMP (also, "the Company"), or likely before that, certan AMP principals became jealous of Ms. Barr's excellent reputation and influence in the aesthetics industry. AMP embarked on a secret plan to damage Ms. Barr's reputation and misappropriate her Intellectual Property.

124.     Pursuant to the Employment Agreement Section 3(c), Ms. Barr was hired to be AMP's **sole provider of clinical training for all AMP products**.  Becoming and remaining AMP's exclusive provider of this service was an extremely important consideration in Ms. Barr's decision to join AMP.

125.     On information and belief, AMP executives, fearful of Ms. Barr's good will and influence in the industry, induced Ms. Barr, with false promises of future company ownership, into disclosing her secret training techniques and medical protocols to other AMP employees.

126.     The now obvious reason AMP did this was so that employees trained by Ms. Barr could take over Ms. Barr's contractual role as **sole provider of clinical training for all AMP products,** using Ms. Barr's own proprietary training methods and information.

127.     Specifically, shortly before Ms. Barr was purportedly terminated on or about April 18, 2019, AMP placed her in contact with Dr. Larry Helwig for the purpose of having him become familiar with her vast knowledge of body treatment protocols.

128.     AMP told Ms. Barr that Dr. Helwig would become an additional resource for the Company of which she was now a part.

129.     AMP did not tell Ms. Barr they had already planned to replace her with him.

130.     It is now clear that AMP's real intention all along was to first manipulate Ms. Barr into teaching her trade secret information and know-how to Dr. Helwig, and to then replace her with Dr. Helwig, and this is exactly what they did.

**Amp's Purported Termination of Ms. Barr For Breach of the
Employment Agreement Was Part of Amp's Plan to Steal
Barr's IP, Ruin Her Reputation in the Industry and
Deprive Her of the Promised Company Ownership Position**

131.     Once AMP had fraudulently obtained Ms. Barr's trade secrets, through their scheme using Dr. Helwig and others, they devised an excuse to quietly remove Ms. Barr from the company without compensating her for her trade secrets and without keeping their promise to give her a future ownership interest in AMP.  (The damages for breach of AMP's promise to Ms. Barr, regarding her future ownership interest in AMP is the subject of a separate lawsuit in Colrado District Court in Boulder Colorado that is outside the jurisdiction of this Arbitration.)

132.     The excuse AMP used for its purported termination of Ms. Barr was that Ms. Barr had breached Section 6(c) of the EMPLOYMENT AGREEMENT by engaging in "conduct considered by the Company to be …plainly adverse to the interest, reputation or business of the Company." (As set forth in a Notice of Termination and General Release **(Exhibit 2**). However, AMP provide no specific incidents of such conduct.

133.     Ms. Barr vehemently denies AMP's allegation.  She was an exemplary employee.

134.     The real reason Ms. Barr was purportedly terminated was to provided AMP with an excuse to justify their reneging on their obligations to Ms. Barr under the EMPLOYMENT AGREEMENT.

135.     However, even if this termination of Ms. Barr under the Employment Agreement had been justified, and it was not, it clearly would not excuse the theft of Ms. Barr's intellectual property and AMP's attempted destruction of her reputation in the industry.

136.     Ms. Barr created and owned this IP and never transferred it to AMP.

137.     AMP took Ms. Barr's IP through deception and disparaged her.

138.      AMP is oligated to compensate Ms. Barr for her IP and the damage to her business reputation that they caused.

139.     AMP and its customers should be prevented from disclosing or using Ms. Barr's IP.

140.     The manner in which AMP terminated Ms. Barr to justify stealing her IP and reneging on their promises to pay her expenses and commissions and to give her a Company ownership position, was particularly overreaching and unethical in that it effectively deprived Ms. Barr of representation of counsel.

142.      On  April 18, 2019, Ms. Barr was preparing for a presentation with a group of surgeons at a venue in Denver, Colorado.  Shortly before her schedule presentation, AMP's  corporate attorney Mark Crosby called her and told her to meet him and AMP company officer Eric Dowell across the street from the venue.  He said it was for a "quick meeting prior to the event."

143.     Ms. Barr went to the meeting place as instructed, and was presented, without prior notice, with a Termination letter and a General Release.

144.     Ms. Barr is not an attorney.  Had Ms. Barr known the meeting was to be a termination meeting, she would have brought her attorney and her husband and business partner Adam Barr.  However, Attorney Crosby and Mr. Dowell clearly did not want this to happen. They wanted to meet with Ms. Barr alone, witout counsel,  so they could bully and intimidate her into signing a General Release that she had never seen before that meeting.

145.     Attorney Crosby and Mr. Dowell told Ms. Barr she could talk to an attorney, but that if she did, she would be terminated immediately, and that, as a result, she would <u>not</u> get the equipment back, nor would she be paid one penny more than her last pay check.

146.     To further intimidate Ms. Barr into signing the release immediately, Crosby and Dowell told her they had taped evidence of her saying unflattering things about AMP officer, Adrian Bishop, and because of these statements she had breached the non-disparagement provision of  her Employment Agreement and could be immediately terminated.

147.     In the absence of legal advice from her own attorney, Attorney Crosby and Mr. Dowell's threat was very effective, because Ms. Barr had actually said some unflattering things about Mr. Bishop. However, as her own attorney would have told her, the unflattering  things Ms. Barr had said about Adrian Bishop were not "disparagement," because what she had said was true.

148.     The unflattering things Ms. Barr had said about Adrian Bishop involved, among other things, his refusal to pay the very substantial unreimbursed expenses AMP owed Ms. Barr, including expenses for her mother's work for the Company for the past year.  Ms Barr was also very upset with Mr. Bishop because of his intoxicated and unprofessional conduct on a business trip with Ms. Barr to Korea.

149.     Ms. Barr was particularly incensed about Mr. Bishop's conduct in Korea, because she felt Mr. Bishop's conduct reflected poorly on AMP, a company of which she was a corporate officer.  Moreover, Ms. Barr had helped build AMP's business through Ms. Barr's significant good will in the industry and her many distributor contracts for aesthetic equipment that Ms. Barr had transferred to AMP when she joined the Company.  Mr. Bishop's conduct had been an embarrassment to the Company and an embarrassment to Ms. Barr who was accompanying him as  AMP's Vice President of Clinical and Product Development.

150.     On information and belief Barr's purported termination was retaliation by AMP for her speaking the truth about Adrian Bishop's conduct.

151.  Ms. Barr had been an exemplary employee, as evidence by the fact she had won an award as outstaning AMP employee of the year and a vacation in Mexico.  She had won this award shortly before the purported termination on April 18, 2019.

152.     Ms. Barr signed the General Release, under duress, on April 18, 2019.  According to the language of the General Release Ms. Barr purportedly forfeited her rights to the Company ownership position promised to her and purportedly forfeited all the other claims she had against AMP at that time.

However according to the Release language, she was allowed to keep the three aesthetic systems in her possession ("the Equipment") for her continued use provided, generally, she adhered to the same non-disparagement and non-solicitation terms as in the original EMPLOYMENT AGREEMENT.

153.     AMP next decided that reneging on their promise to give Ms. Barr an ownership position in the Company and taking her IP without compensation and not paying her commissions and expenses was not sufficient punishment for being an outspoken vice president.  They now wanted to futher punish Ms. Barr for having the temerity to tell the truth about Adrian Bishop's misconduct.

154.     On October 9, 2019, AMP, through its attorneys, filed the VERIFIED DEMAND FOR ARBITRATION (**Exhibit 4**) alleging generally, that Ms. Barr had breached the General Release, which Ms. Barr denies, and that AMP then had the right to repossess the Equipment she had received from them under the General Release, which Ms. Barr also denies. Thus, AMP improperly reneged for a second time on promises made to Ms. Barr—this time it was the promise to allow her to keep the equipment, a promise they had made as an enticement for her to sign the General Release.  This action by AMP was a breach of the General Release, excusing any obligations Ms. Barr's had, if any, under the General Release.

155.     Ms. Barr had no legal obligation to return the Equipment to AMP, as explained in  an email to AMP's attorney Michelle Choe on October 23, 2019 from Ms. Barr's attorney, Bill Cochran's (Attached as **Exhibit 3**.) Nevertheless, on October 31, 2019, Ms. Barr made the Equipment available to AMP and AMP took possession of the Equipment, effectively making the entire purported purpose of the VERIFIED DEMAND FOR ARBITRATION mute.

156.     On November 13, 2019, AMP filed the VERIFIED AMENDED DEMAND FOR ARBITRATION. The VERIFIED AMENDED DEMAND (**Exhibit 5**) includes new or revised Paragraphs  20-27 relating to the encounter on April 18, 2019 in which Ms. Barr was pressured into signing with the General Release. Ms. Bar generally denies all allegations made in paragraphs 20-27 of the  VERIFIED AMENDED DEMAND FOR ARBITRATION  that are not in accord with her above description of the events of that day, April 18, 2019.

159.     Paragraph 29 of the AMENDED VERIFIED DEMAND FOR ARBITRATION alleges that Ms. Barr had breached her non-solicitation and non-disparagement obligations under the General Release.  Ms. Barr denies this and denies she breached any provisions of the General Release.

160.     In Paragraph 29 sections a and b of the AMENDED VERIFIED DEMAND FOR ARBITRATION AMP alleges that Ms. Barr solicited Chase Craigo to break his employment contract with AMP.  That

allegation is denied.  Chase Craigo and Ms. Barr were friends.  Chase asked Ms. Barr how she would handle a tax reporting situation .he was facing.  Ms. Barr is not an attorney and was merely giving Chase friendly advice based on her own experience.  She was not soliciting Chase to break his employment contract with AMP.

161.    Paragraph 29 section c of the AMENDED VERIFIED DEMAND FOR ARBITRATION  indicates that Ms. Barr had breached the non-solicitation and non-disparagement provisions of the General Release by complaining about the cost of an AMP product to a company supplier.  A mild complaint to a company supplier from a company employee about the company's own product is, if anything, likely to make that company employee appear more forthright and trustworthy to the supplier, particularly when the employee making the statement believed the statement made to be true.  Ms. Barr was trusted by her clients and customers because of her honesty. Customers know they can count on what she says to be true.  No disparagement takes place if the allegedly disparaging statement is true or is believed to be true by the person making the statement.  To be disparaging, a statement must be untrue and must also be made with malice.  There was nothing malicious about this statement that Ms. Barr made and believed to be true and, on information and belief, was true.  Furthermore, a non-disparagement provision does not require the party subject to it to lie to others or to hide any facts that paint the company in anything but the most favorable light.  There was no solicitation made to anyone by Barr in any of her statements to the copany supplier.

162.    In paragraph 29 section d and e of the AMENDED VERIFIED DEMAND FOR ARBITRATION, it is alleged that Ms. Barr had violated the non-solicitation and non-disparagement provisions of the General Release by repeating a story about marital misconduct that someone else in the Company had witnessed and which appeared to be common knowledge in the Company.  This allegation about Ms. Barr's statements is denied.  For disparagement to exist, the allegedly disparaging statement must be false.  On information and belief, the statement made by Ms. Barr was true, Marinda Hayes and Adrian Bishop were having an affair, so, because it was true, it cannot be disparagement. Furthermore, for disparagement to apply, the statement made must be made with malice, i.e., with ill will.  That was not the case.  Ms. Barr and Marinda Hayes had been friends and Ms. Barr reported the company gossip to Susan Crowe because she thought Ms. Crowe would tell Ms. Hayes that Ms. Barr was concerned about Ms. Hayes reputation.  Ms. Barr's comment regarding the situation not going well merely an expression of her concern that an open office affair with her boss was unlikely to end well for either party involved.  Ms. Barr's speaking out to Susan Crowe about the incident was to alert Marinda about the gossip so she could take steps to change her conduct.  Also, this statement regarding the affair was made by company employees or contractors to other company employees or contractors.  No one was soliciting anyone outside the company to do anything.  On information and belief, the Company suffered no financial losses as a result of these statements.

163.   In paragraph 29 section f of the AMENDED VERIFIED DEMAND FOR ARBITRATION, it is unclear from the Claimant's exhibit that Craigo actually "owned" this account or what was actually communicated. Ms. Barr's message adequately explained the situation. She had merely recommended another machine to a good client rather than allowing him to pay too much for the machine he was considering—a practice that tends to maintain clients for the company and improve the company's reputation.  Making true statements and maintaining a reputation for honesty in the company sales force would seem to be laudable business practices for a reputable company, not improper solicitation or disparagement.  On information and belief, there were no damages sustained from these statements.

### AMP's breach of the EMPLOYMENT AGREEMENT and/or the GENERAL RELEASE

164.   The Employment Agreement at section 8(d) provides.

The Non-disparagement clause of the Employee Agreement Section 8(d)  (which provision was also incorporated into the General Release) states: **"During the Employment Period <u>and for two (2) years thereafter</u>…*neither the Company nor any of its affiliated companies or businesses or their affiliates, nor anyone authorized by the Company to speak on behalf of the Company, shall make or publish any disparaging or derogatory statement (whether written or oral) regarding the Employee."***

165.   Thus, AMP's duty not to disparage Ms. Barr was an ongoing obligation under this Section 8(d) provision of the Employment Agreement that remained in effect for two year after any termination of the Agreement. AMP's purported termination of Ms. Barr under the Employment Agreement and reporting of it to third parties took place on or shortly after April 18, 2019.  The date of any disparaging  statement since then until the present date is clearly within two (2) years of April 18, 2018, and thus AMP's non-disparagement duties to Ms. Barr remain in effect under the above provision of the Employment Agreement, even if it had been properly terminated by AMP. The above provision of the Employment Agreement is incorporated into the General Release and was effective, whether the General Release is valid or not, because of its two year duration from termination under the Employment Agreement.

166.   The EMPLOYMENT AGREEMENT, Section 8(d) that prohibits AMP from disparaging Ms. Barr <u>was breached by AMP when it disparaged Ms. Barr to Ira Schiff</u> as described below:

Immediately after Ms. Barr's received AMP's Notice of Termination, Erik Dowell of AMP contacted Ms. Barr's employee, Ira Schiff, and began recruiting him to work for AMP as a trainer. Ira Schiff provided Ms. Barr a written statement detailing the encounter. As a result of this disparagement, Ira Schiff left Ms. Barr's employment and accepted a position with AMP a few weeks later.

167.    On information and belief, Erik Dowell, while soliciting Ira Schiff to join AMP, told Ira Schiff that AMP had terminated Ms. Barr. Erik Dowell's statements to Ira Schiff also violates the below mutual covenant of the General Release:

> 2.    The General Release expressly states: ***"the parties' mutual covenant, hereby made, not to depart from publicly representing to any interested parties that Company did not terminate Employee, but rather Employee and Company mutually agree to pursue separate ventures and have parted amicably as of the today."***

168.    Public disclosures by AMP of Ms. Barr's termination include the following further incidents:

I.) Agnes continued to actively communicate with Trina and engaged in discussions to employ her services for clinical training, distribution, direct sales and regulatory services. However, those opportunities were interrupted due to AMP's disparaging protests to Agnes and their disclosure of Ms. Barr's termination to Agnes. As a result, Ms. Barr endured loss of business opportunities.

II.) AMP has also disparaged Ms. Barr's reputation to Energist (a supplier of parts, etc. for Neogen products)  and influenced Energist  to not communicate with Ms. Barr. This disparagement of Ms. Barr by AMP has damaged Ms. Barr's ability to support her clients that have questions related to the Neogen devices. As an example, Ms. Barr had sold the Neogen device to Dr. Bachurina before Ms. Barr joined AMP.  However, Ms. Barr was unable to provide adequate support to Bachurina because of AMP's derogatory statements and insistence to Energist that Ms. Barr not be allowed to support the Neogen product.

## MS. BARR DAMAGED BY UNAUTHORIZED DISCLOSURE AND
## USE OF HER INTELLECTUAL PROPERTY BY AMP AND ITS CUSTOMERS

169.    As a direct result of AMP's deceitful actions, Ms. Barr has been damaged and will be further damaged by all unauthorized uses or disclosures of her intellectual property by AMP and its affiliates and customers.  Ms. Barr is entitled to an accounting and a reasonable royalty from AMP for each medical protocol and each teaching method developed by her that AMP has used or disclosed to others since her wrongful discharge on April 18, 2019.  Ms. Barr is also entitled to an injunction preventing any future use and preventing any further disclosure or use of her IP by AMP and any of its affiliates or customers.

## MS. BARR DAMAGED BY LOST SALES AS A RESULT OF
## AMP'S BREACH OF ANTI-DISPARAGEMENT PROVISION

170.  On information and belief, Ms. Barr lost a number of sales due to AMP's disparagement of her.

**MATTERS INVOLVING MS. BARR'S WAGE CLAIM AGAINST AMP**

**MAY NOT PROPERLY BE CONSIDERED IN THIS ARBITRATION--**

**COLORADO STATE COURT HAS EXCLUSIVE JURISDICTION**

171.     Claimant's Statements in Paragraphs 38-58; 65-70; and 74-77 deal with matters that are the subject of Ms. Barr's separate litigation complaint under The  Colorado Wage Claim Act, filed on December 10, 2019, in Boulder County District Court of Colorado.

172.     Under *Colorado Revised Statutes Section 8-4-125*, an agreement to arbitrate that conflicts with the rights established by the Colorado Wage Claim Act, *Colorado Revised Statutes Sections 8-4-101 to - 126 (1986 & 1994),* cannot be enforced against the employee. See, Lambdin v. District Court in the 18th Judicial District, Supreme Court of Colorado, *EN BANC*, October 10, 1995; 903 P.2d 1126, 1128; 1995 Colo LEXIS 662, 662.

173.     In Lambin v. District Court in the 18th Judicial District,  Sun Microsystems, the defendant in a Colorado District Court action, had hired Plaintiff Ken Lambdin to work in its Englewood, Colorado office as a sales representative.  Lambdin's compensation included a base salary and commissions from sales. Sun calculated and determined eligibility for commissions according to a Sales Representative Incentive Compensation Plan. **The Compensation plan included an arbitration provision requiring any controversy or claim relating to the plan to be resolved in Palo Alto, California according to the Commercial Arbitration Ruses of the American Arbitration Association and California law**.  A dispute arose between Lambdin and Sun over a commission payment.  Lambdin filed a complaint in Colorado's  Arapahoe County District Court under *Col. Rev. Stat.* § 8-4-104.  Sun filed a motion to dismiss or in the alternative to stay proceedings pending arbitration pursuant to C.R.C.P. 12(b)1 and section 13-22-204, 64 C.R.S. (1987) of the Uniform Arbitration Act of 1975 (UAA).

174.     The trial court granted Lambdin's motion and ordered a stay pending conclusion of arbitration proceedings.  The trial court directed that the case proceed to arbitration under the compensation plan's arbitration clause.  Lambdin appealed to the Colorado Supreme Court, which issued a rule to show cause to stay the trial court order that mandated arbitration.  The Supreme Court held that Colo. Rev. Stat. § 8-4-125 voided any agreement that constituted a waiver or modification of an employee's rights under the Wage Claim Act, *Colo. Rev. Stat.* §§ 8-4-101-126.  Enforcement of the arbitration agreement constituted a waiver of the right set out in § 8-4-123 of the Wage Claim Act to institute a civil suit to recover wages. Thus, the arbitration agreement had violated § 8-4-125 and was void under that section.

175.     A nearly identical fact situation exists in the present wage claim dispute between Ms. Barr and AMP.  Enforcement of the Employment Agreement's arbitration provision by AMP would constitute a waiver of Ms. Barr's right set out in § 8-4-123 of the Wage Claim Act to institute a civil suit to recover her unpaid wages.  Thus, the arbitration provision of the AMP Employment Agreement violates § 8-4-125 and is void under that section.

177.     Accordingly, all matters dealing with Ms. Barr's unpaid compensation may not properly be considered by the Arbitrator in the present arbitration.  The Colorado District Court, in which Ms. Barr has filed her complaint, has exclusive jurisdiction regarding this wage claim matter.

178.     Thus, Respondent submits that the Arbitrator, due to lack of jurisdiction, must ignore all material and Requests for Relief  in AMP's VERIFIED AMENDED DEMAND FOR ARBITRATION that are related to the issue of Ms. Barr's unpaid compensation, including Paragraphs 38-58; 65-70; and  74-77 of the AMENDED DEMAND.

### FIRST CLAIM FOR RELIEF

179.     Respondent hereby incorporates by reference the preceding allegations of this Answer to Verified Amended Demand and Counterclaim of Respondent as though fully set forth herein.

180.     Ms. Barr counterclaims for damages from lost business due to disparagement of Ms. Barr by AMP.

### SECOND CLAIM FOR RELIEF

181.     Respondent hereby incorporates by reference the preceding allegations of this Answer to Verified Amended Demand and Counterclaim of Respondent as though fully set forth herein.

182.     Ms. Barr counterclaims for AMP's misappropriation of Ms. Barr's IP and/or any use or disclosure of Ms. Barr's trade secrets by AMP, including monetary damages therefor and an injunction prohibiting use or disclosure of Ms. Barr's tradesecrets by AMP and AMP's customers .

### THIRD CLAIM FOR RELIEF

1.83     Respondent hereby incorporates by reference the preceding allegations of this Answer to Verified Amended Demand and Counterclaim of Respondent as though fully set forth herein.

184.	Ms. Barr counterclaims for the fair market value of the equipment improperly repossessed from Ms. Barr by AMP. There was no breach of the General Release by Ms. Barr, who was in rightful possession of the equipment.  The General Release was breached by AMP.


**RELIEF SOUGHT**

WHEREFORE, Ms. Barr requests the following relief against AMP:

185.	Monetary damages for disparagement of Ms. Barr by AMP in the amount determined by the Arbitrator.

186.	An injunction against AMP preventing any future disparagerment of Ms. Barr within the aesthetics industry.

187.	Montary damages for the fair market value of the equipment wrongfully repossessed from Ms. Barr by AMP, as determined by the Arbitrator.

188.	A finding and declaration by the Arbitrator that the Arbitrator has no jurisdiction over a wage claim between Ms. Barr and AMP that is the subject of a Case No. _____ in Colorado District Court in Boulder County Colorado.

## AFFIRMATIVE DEFENSES

189. Claimant fails to state a claim upon which relief can tbe granted.

190.  Claimant's claims fail for Claimant's breach of one or both of the two Agreements at issue, excusing obligations of Respondents to perform under one or both Agreements.

## AMOUNT ENCLOSED

191.	None, because there is no charge for an Answer or Counterclaim.

## HEARING LOCAL

192.	Memphis, Tennessee.

<u>NOTICE</u>

193.     The Claimant is hereby notified that this Answer and Counterclaim and attached exhibits are being filed with the AAA.

Date: December 16, 2019

Respectfully submitted,

<u>s/William P. O'Meara/</u>
William P. O'Meara
<u>billo@patentlegal.com</u>
303-263-1217
William Wallace Cochran II
billc@patentlegal.co,
Cochran Freund & Young LLC
2026 Caribou Drive, Suite 201
Fort Collins, Colorado 80525
(970) 492-1100
(970) 492-1101 Facsimile
(970) 215-3191 Cell
<u>http://www.patentlegal.com</u>

Attorneys for Responsent Trina Barr

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on this 16th day of December 2019, a copy of the foregoing **ANSWER TO VERIFIED AMENDED DEMAND FOR ARBITRATION AND COUNTERCLAIM OF RESPONDENT** was filed with the American Arbitration Associate, and a copy of same sent electronically to the following parties:

Raymond W. Martin and Michele O. Choe
Wheeler Trigg O'Donnell LLP
370 Seventeenth St., Suite 4500
Denver, Colorado 80202
(303) 244-1800
martin@wtotrial.com
choe@wtotrial.com


*s/ Joy Reinhart for William O'Meara*